**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LUCK'S MUSIC LIBRARY, INC.            :
and MOVIECRAFT, INC.,                 :
                                      :
                    Plaintiffs,       :        Civil Action No.:    01-2220 (RMU)
                                      :
          v.                          :        Document No.:        8
                                      :
JOHN ASHCROFT, Attorney               :
General of the United States,         :
and MARYBETH PETERS, Register         :
of Copyrights, Copyright              :
Office of the United States,          :
                                      :
                    Defendants.       :

**MEMORANDUM OPINION**

**GRANTING THE DEFENDANTS' MOTION TO DISMISS**

**I. INTRODUCTION**

This case comes before the court on the defendants' motion to dismiss.  The plaintiffs

Luck's Music Library, Inc. ("Luck's Music") and Moviecraft, Inc. ("Moviecraft") (collectively,

"the plaintiffs") bring suit alleging that Section 514 ("Section 514") of the Uruguay Round

Agreements Act ("the URAA"), Pub. L. No. 103-465, amending 17 U.S.C. § 104A, is

unconstitutional.  Defendants  John Ashcroft, Attorney General of the United States, and

Marybeth Peters, Register of Copyrights (collectively, "the defendants") move to dismiss the

instant case on the ground that the plaintiffs failed to state a claim on which relief can be

granted.  Because Section 514 does not overstep Congress' power under the Intellectual Property

clause of the Constitution ("IP Clause") and does not violate the First Amendment, the court

grants the defendants' motion to dismiss.

1

## II.  BACKGROUND

### A.  The Uruguay Round Agreements Act

Section 514  implements Article 18 of the Berne Convention for the Protection of

Literary and Artistic Works ("the Convention").[1]  S. REP. NO. 103-412, at 225 (Nov. 22, 1994).

The Convention governs the international enforcement of copyright law.  S. REP. NO. 100-352, at

2, (May 19, 1988).  Since its entry into force in 1886, the Convention requires member countries

to afford the same copyright protections to foreign copyright holders that they provide to their

own citizens.  Convention, Art. 5.  The United States ratified the Convention in 1988.  134

CONG. REC. 32018 (Oct. 20, 1988).

Article 18 of the Convention provides that a member country must apply the protections

in the Convention to all works that have not yet fallen into the public domain through the

expiration of the copyright's term in its origin country.[2]  Section 514 restores copyright to

foreign copyright holders whose works remain protected in their origin country, but entered the

public domain in the United States due to the (a) failure of the foreign copyright holder to

comply with the United States' copyright formalities, (b) absence of prior subject-matter

---

[1]  The URAA implemented the General Agreement on Tariffs and Trade 1994 ("GATT").  S. REP. NO. 103-412, at 3, (Nov. 22, 1994).  Title V of the URAA implements the Agreement on Trade Related Aspects of Intellectual Property Rights ("TRIPs"), which requires compliance with the Articles 1-21 of the Berne Convention.  *Id.*

[2]  Article 18 of the Berne Convention provides, in relevant part, that:

> (1) This Convention shall apply to all works which, at the moment of its coming into force, have not yet fallen into the public domain in the country of origin through the expiry of the term of protection.

> (2) If, however, through the expiry of the term of protection which was previously granted, a work has fallen into the public domain of the country where protection is claimed, that work shall not be protected anew[.]

2

protection such as sound recordings fixed before 1972, or (c) failure of the United States to

recognize copyrights from that country.[3]  17 U.S.C. § 104A(h)(6).

Section 514, however, allows some latitude for parties who relied on the fact that the

foreign works were in the public domain prior to the date of restoration.  *Id.* § 104A(d)(1).

Specifically, Section 514 prevents restored copyright holders from enforcing their copyright

against another party without providing the party with a notice of intent to enforce the restored

copyright.  *Id.* § 104A(d)(2).  After receiving a notice of intent to enforce a restored copyright, a

party has one year to stop the infringing behavior.  *Id.*  Finally, if the party created a derivative

work from the restored copyrighted work, that party may continue to exploit the work if it

---

[3]   Section 104A provides, in relevant part,

§ 104A.  Copyright in restored works

(a) Automatic protection and term.
(1) Term.
(A) Copyright subsists, in accordance with this section, in restored works, and vests
automatically on the date of restoration.
. . .

(h) Definitions.  For purposes of this section and section 109(a):
. . .

(6) The term "restored work" means an original work of authorship that--
(A) is protected under subsection (a);
(B) is not in the public domain in its source country through expiration of term of
protection;
(C) is in the public domain in the United States due to--
(i) noncompliance with formalities imposed at any time by United States
copyright law, including failure of renewal, lack of proper notice, or failure
to comply with any manufacturing requirements; (ii) lack of subject matter
protection in the case of sound recordings fixed before February 15, 1972;
or (iii) lack of national eligibility;
(D) has at least one author or rightholder who was, at the time the work was created,
a national or domiciliary of an eligible country, and if published, was first published
in an eligible country and not published in the United States during the 30-day
period following publication in such eligible country.

reasonably compensates the restored copyright holder.  *Id.* § 104A(d)(3)(A).

## B.  Luck's Music

Luck's Music is a family-owned corporation that repackages and sells works already in the public domain.  Compl. ¶¶ 28-29.  In particular, it sells and rents classical orchestral sheet music to more than 7,000 orchestras ranging from elementary to operatic and to 12,000 individuals worldwide.  *Id*. ¶ 28.  Much of Luck's Music's catalog of music consists of music composed and published in countries ineligible for copyright in the United States due to their refusal to provide reciprocal protection.  *Id*. ¶ 30.  For example, Russian works published in the former Soviet Union such as *Peter and the Wolf* and *Love and Three Oranges* by Prokofiev; *Symphony No. 5* and *Festive Overture* by Shostakovich; *Masquerade Suite* and *Sparticus Ballet* by Khatchaturian; *Russian Sailor's Dance* and *Red Poppy Ballet Suite* by Glier; *The Comedians*, *Piano Concerto*, and *Cello Concerto* by Kabalevsky; and *Soldier's Tales* and *Symphony of the Winds* by Stravinsky remained in the public domain in the United States.  *Id*. ¶¶ 30-31.  Works ineligible for copyright composed ten percent of Luck's Music's total inventory and netted average annual sales of $150,000.  *Id.* ¶ 30.

Congress' passage of Section 514 restored copyright to these works.  *Id.* ¶ 31.  After the passage of Section 514, Luck's Music received several notices of intent to enforce copyright, demanding that Luck's Music cease and desist from selling 200-300 different works from Russian composers, including Prokofiev, Shostakovich, Khatchaturian, Giler, Kabalevsky, and Stravinsky.  *Id*.  During  the one-year  grace period provided for under section 104A, Luck's Music was unable to sell its entire inventory of Russian works.  *Id.*

### C.  Moviecraft

Moviecraft is a family-owned business that preserves films dating back to the early 1900s.  *Id.* ¶ 35.  It archives various films and works ranging from World's-Fair footage, industrial films, short films, films with historical subjects, newsreels and cartoons to old television features and shows such as *Sheena, Queen of the Jungle* (1955) and *Dupont Cavalcade of America* (1956).  *Id.* ¶ 36.  Its film archive consists of 40,000 titles and 200,000 film elements such as negatives and reels.  *Id.*  To pay for archiving and preserving these works, Moviecraft makes and sells copies of these works for home use as well as derivative works such as documentaries, commercials, and compilations.  *Id.* ¶¶ 37-38.

Moviecraft's current library includes thousands of foreign films in the public domain due to lack of copyright notices.  *Id.* ¶ 39.  It obtained and preserved many of these films, expecting to defray its purchase and preservation costs through their sales for derivative works.  *Id.*  It also planned to release *The Sicilian*, a 1963 foreign movie in the public domain, for sale on home video.  *Id.* ¶ 41.

Section 514, however, restored copyrights to many of the foreign works that Moviecraft obtained and restored.  *Id.* ¶ 40.  As a result of this copyright restoration, Moviecraft cannot duplicate these films for use in derivative works with assurances that the restored copyright will not be enforced.  *Id.*  Accordingly, many of Moviecraft's customers refuse to purchase and use the foreign works.  *Id.*  In addition, Moviecraft gave up plans for releasing *The Sicilian* after receiving a notice of intent to enforce the restored copyright.  *Id.* ¶ 41.

### D.  Procedural History

The plaintiffs filed their complaint on October 29, 2001, asking for declaratory and

injunctive relief. *See generally id*  On February 15, 2002, the defendants moved to dismiss the

instant case for failure to state a claim on which relief can be granted.  After filing briefs, the

court granted the parties' joint request to stay the case pending the the Supreme Court's ruling in

*Eldred v. Reno*, a copyright case.  After the Supreme Court decided *Eldred*, 537 U.S. 186 (2003),

both parties filed supplementary briefs addressing *Eldred*'s effect on the issues in the instant

case.  The court now turns to the defendants' motion to dismiss.


### III.  ANALYSIS

#### A.  Legal Standard for Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint.  *Browning v.

Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  The complaint need only set forth a short and plain

statement of the claim, giving the defendant fair notice of the claim and the grounds upon which

it rests.  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003) (citing

FED R. CIV. P. 8(a)(2) and *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Such simplified notice

pleading is made possible by the liberal opportunity for discovery and the other pre-trial

procedures established by the Rules to disclose more precisely the basis of both claim and

defense to define more narrowly the disputed facts and issues."  *Conley*, 355 U.S. at 47-48

(internal quotation marks omitted).  It is not necessary for the plaintiff to plead all elements of

his prima facie case in the complaint, *Swierkiewicz v. Sonoma N.A.*, 534 U.S. 506, 511-14

(2002), or "plead law or match facts to every element of a legal theory."  *Krieger v. Fadely*, 211

F.3d 134, 136 (D.C. Cir. 2000) (internal quotation marks and citation omitted).

Accordingly, "the accepted rule in every type of case" is that a court should not dismiss a

complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C. Cir. 2004); *Kingman Park*, 348 F.3d at 1040. Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Development v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003); *Browning*, 292 F.3d at 242. While many well-pleaded complaints are conclusory, the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Warren*, 353 F.3d at 39; *Browning*, 292 F.3d at 242.

### B. Legal Standard for Interpretation of the Intellectual Property Clause

The Constitution's IP clause grants Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. Art. I, § 8, cl. 8. Accordingly, the IP clause provides Congress with the power to grant a limited monopoly through copyrights or patents to authors or inventors for their particular writings and inventions. *Mazer v. Stein*, 347 U.S. 201, 207-09 (1954). The IP clause "is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of the exclusive control has expired." *Sony Corp. of Am. v. Universal Studios, Inc.*, 464 U.S. 417, 429 (1984).

The Constitution grants Congress the power to select, in its judgment, the best policy by

which to effectuate the stated purpose of the IP clause.  *Graham v. John Deere Co.*, 383 U.S. 1, 6 (1966).  The court, therefore, defers substantially to Congress for its policy decisions on copyright law.  *Eldred*, 537 U.S. at 212.  "The courts will not find that Congress has exceeded its powers so long as the means adopted by Congress for achieving a constitutional end are 'appropriate' and 'plainly adapted' to achieving that end."  *Schnapper v. Foley*, 667 F.2d 102, 112 (D.C. Cir. 1981) (citing *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 860 (5th Cir. 1979)).  Further,  "[courts] are not at liberty to second-guess congressional determinations and policy judgments of this order, however debatable or arguably unwise they may be."  *Eldred*, 537 U.S. at 208.

### C. The Court Concludes That Section 514 Does Not Exceed Congress' Power Under the IP Clause

The plaintiffs claim that Section 514 oversteps the powers granted to Congress in Article I and violates the First Amendment.  Compl. ¶ 46.  Specifically, the plaintiffs assert that the IP clause requires the public to have free access to copy and use works once they have fallen into the public domain.  *Id.*  By enacting Section 514 and granting retroactive copyrights to various works, the plaintiffs argue, Congress violated the IP clause  *Id.*  The plaintiffs also assert that Congress' enactment of Section 514 rests outside the powers the IP clause grants because Section 514 grants retroactive copyrights to works that are not original and does not promote the progress of science and the useful arts.  Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 24-27.  In turn, the defendants argue that the enactment of Section 514 falls within the authority of the IP clause, or, alternatively, that other powers in Article I grant Congress the power to enact Section 514.  *See generally* Defs.' Mot. to Dismiss ("Defs.' Mot.")  The court concludes that Section 514 does not violate the IP clause and, therefore does not address whether there are

8

other constitutional powers through which Congress might pass Section 514.  Because Section 514 is Constitutional, the plaintiff cannot prove any set of facts upon which relief can be granted. *Warren*, 353 F.3d at 37.

### 1.  Congress Has Traditionally Exercised Restorative Copyright Powers

The defendants seek to establish that Section 514 is constitutional by demonstrating a history of retroactive copyrighting based on previous acts and proclamations tracing back to the founding of the United States.  Defs.' Mot. at 12.  The defendants assert that the Copyright Act of 1790 ("1790 Act"), 1 Stat. 124, established retroactive copyright, and several presidential declarations continued the tradition of restoring copyrights retroactively without constitutional challenge.  *Id.* at 12-14.  In response, the plaintiffs argue that the 1790 Act simply codified a state-based statutory copyright, or, to the extent states did not have a copyright statute, common law copyright.  Pls.' Opp'n at 21-23.  The plaintiffs also contend that the presidential proclamations only applied to copyright holders who could not meet statutory formality requirements during times of war.  *Id.*  The plaintiffs' arguments, however, are unpersuasive.

"To comprehend the scope of Congress' power under the [IP clause], 'a page of history is worth a volume of logic.'"  *Eldred*, 537 U.S. at 200 (quoting *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).  A consistent congressional exercise of  its power under the IP clause since the forming of the constitution "is entitled to very great weight."  *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884).  Thus, an unbroken practice of granting retroactive copyrights and removing works from the public domain since the founding of the Constitution would seriously impede the plaintiffs' argument that Section 514 violates an implicit public domain

within the IP clause.  *Id.*; *see also Eldred*, 537 U.S. 199-201 (citing an unbroken practice of extending copyrights in holding that the Copyright Term Extension Act is constitutional).

### a.  Congress Created Copyrights by Enacting the 1790 Act

The 1790 Act granted copyright protection to all books, maps and charts "already printed within these United States" at the time of enactment.  1 Stat. 124.  The plaintiffs' interpretation that the 1790 Act merely codified existing copyright law requires the assumption that either all states had copyright statutes enacted or that a common-law of copyright existed in the United States.  Pls.' Opp'n at 22; Pls.' Supplemental Mem. at 4.  If neither of these bodies of law existed, then Congress' implementation of the 1790 Act would have created copyright law and granted retroactive copyrights to works already in the public domain.  A review of state statutes before the ratification of the Constitution and the enactment of the 1790 Act reveals that the plaintiffs' argument is flawed.

Before the ratification of the Constitution, the Articles of Confederation granted any powers not expressly delegated to Congress to the States.  Articles of Confederation, Art. II. Because the Articles of Confederation did not vest Congress with the power to protect intellectual properties, it fell to each state to pass its own copyright statute.  EDWARD C. WALTERSCHEID, THE NATURE OF THE INTELLECTUAL PROPERTY CLAUSE: A STUDY IN HISTORICAL PERSPECTIVE, 31 (2002); *see also* 8 M. NIMMER AND D. NIMMER, NIMMER ON COPYRIGHT, App. 7[B][1] (2003) (hereinafter NIMMER'S COPYRIGHT) (reprinting the Continental Congress' recommendation that states pass intellectual property protection laws).  Not all of the states, however, enacted statutory copyright laws.  LYMAN RAY PATTERSON, COPYRIGHT IN HISTORICAL PERSPECTIVE 183-184 (1968); 8 NIMMER'S COPYRIGHT, App. 7[C] (reprinting the

states' copyright statutes in Appendix 7).  Delaware, Maryland and Pennsylvania never enacted copyright statutes.  BRUCE W. BUGBEE, GENESIS OF AMERICAN PATENT AND COPYRIGHT LAW, (1967) at 123, 124.  Accordingly, three of the original 13 states did not have any kind of copyright protection.  *Id.*  Thus, Congress' actions with the enactment of the 1790 Act created retroactive copyrights for works published by the citizens of these three states.

As noted, the plaintiffs argue that in cases where states did not have a copyright statute in effect, a common-law of copyright existed.  Pls.' Opp'n at 22.  By enabling the 1790 Act, the plaintiffs claim, Congress simply converted these common law rights into statutory law.  *Id.*  The plaintiffs point out that British precedent, the foundation of American common law, supports their position.  Pls.' Supplemental Mem. at 4 (citing *Donaldson v. Beckett*, 98 Eng. Rep. 257 (H.L. 1774) and *Millar v. Taylor*, 98 Eng. Rep. 201 (K.B. 1769)).

Nearly two centuries ago, however, the Supreme Court ruled that a common law copyright did not exist in the United States.  *Wheaton v. Peters*.  33 U.S. 591, 659-661 (1834).  In *Wheaton*, the Court interpreted the words "by securing" in the IP clause to mean that the Constitution gave Congress the power to create a new right through the 1790 Act.  *Id.* at 662.  The Court explained that "securing" had to refer to the creation of a new right, since the Constitution includes both copyright and patent law in the same clause, and patent law had no existing common law equivalent in England.  *Id.* at 661.  The Court further reasoned that any other interpretation would render the IP clause mere surplusage because the result would be a "vest[ing] of a right already vested."  *Id.*  Thus, "Congress, . . . by [the 1790 Act], instead of sanctioning an existing right[,] created it."  *Id.*  Because not every state had a copyright statute

and because no common law right to copyright existed, the plaintiffs' argument that the 1790

Act merely codified existing common law fails.  *Id.*

### b. The 1919 Amendments and the Emergency Act of 1941 Authorizing Restoration of Copyrights Demonstrates A Consistent Congressional Practice

The plaintiffs also argue that several presidential proclamations cited by the defendants

as examples of continued tradition of Congress' restoration of copyrights are inadequate because

the proclamations merely granted administrative extensions of time rather than restoring

copyright to works already in the public domain as Section 514 does.  Pls.' Opp'n at 23-34.  The

defendants, however, assert that the plaintiffs' arguments are "mere wordplay" because

presidential proclamations did not simply extend time for complying with U.S. formalities

regarding copyrights.  Defs.' Reply at 12-13.  Rather, the plaintiffs' claim, the Congressionally

authorized presidential proclamations "gave authors the opportunity to gain copyright protection

for works that had fallen into and would otherwise have remained in the public domain[.]"  *Id.* at

13.

Congress has enacted two statutes allowing the president to exercise powers of copyright

restoration through proclamations.  *See* An Act to Amend Sections 8 and 21 of the Copyright

Act, 41 Stat. 368 (1919) ("1919 Amendment"); Emergency Copyright Act of 1941, 55 Stat. 732

(1941) ("Emergency Act").[4]  Both acts gave the president the power to restore copyrights to

---

[4]  The 1919 Amendment provides that:

> all works made the subject of copyright by the laws of the United States first . . .  published
> abroad after August 1, 1914, and before the date of the President's proclamation of peace,
> of which the author or proprietors are citizens or subjects of any foreign State or nation
> granting similar protection for works by citizens of the United States, the existence of which
> shall be determined by a copyright proclamation issued by the President of the United States,
> shall be entitled to the protection conferred by the copyright laws of the United States from
> and after the accomplishment, . . . of the conditions and formalities prescribed with respect
> to such works by the copyright laws of the Untied States:

12

foreign authors for works published within a specific time period as long as the copyright holder

complied with U.S. copyright formalities and reveal a Congressional practice of restoring

copyrights.  *Id.*  For instance, Presidents Wilson and Harding issued proclamations in 1920 and

1922 respectively that effectively restored copyright to British and German works published

during World War I.  Proclamations of Woodrow Wilson, 41 Stat. 1790 (1920); Proclamations

of Warren Harding, 42 Stat. 2271-2278 (1922).  Later proclamations restored copyrights to

foreign works published on or after September 3, 1939 whose authors complied with U.S.

copyright formalities.  *E.g.*, Proclamation No. 2608, 3 C.F.R. § 2608 (1944) (restoring copyright

to authors from the United Kingdom); Proclamation No. 2722, 3 C.F.R. § 2722 (1947) (France);

Proclamation No. 2729, 2 C.F.R. § 2729 (1947) (New Zealand); Proclamation No. 2863, 3

C.F.R. § 2683 (1949) (Australia); Proclamation No. 2953, 3 C.F.R. § 2953 (1951) (Finland);

Proclamation No. 3353, 3 C.F.R. § 3353 (Austria); Proclamation No. 3792, 3 C.F.R.§ 3792

(1967) (Germany).  In each case, before the president issued the proclamations, published works

---

*Provided further*, That nothing herein contained shall be construed to deprive any person of any right which he may have acquired by the republication of such foreign work in the United States prior to the approval of this Act.

41 Stat. at 369.  The Emergency Act provides that:

That whenever the President shall find that the [copyright owners] of works first produced or published abroad and subject to copyright . . . are or may have been temporarily unable to comply with the conditions or formalities prescribed with respect to such works by the copyright laws of the United States, because of the disruptions or suspensions of facilities essential for such compliance, he may by proclamation grant such extension of time as he deems appropriate for the fulfillment of such conditions or formalities by [copyright owners].

*Provided further*, That no liability shall attach . . . for lawful uses made or acts done prior to the effective date of such proclamation in connection with such works, or in respect to the continuance for one year subsequent to such date of any business undertaking or enterprise lawfully undertaken prior to such date[.]

55 Stat. at 732.

from those countries were automatically part of the public domain.  *Nat'l Comic Pubs., Inc. v. Fawcett Pubs.*, 191 F.2d 594, 598 (2d Cir. 1951).  Thus, these presidential proclamations allowed foreign authors to restore copyright to their works, which had fallen into the public domain in the United States.

The plaintiffs' argument that power vested by these statutes did not restore copyright but simply created an administrative extension of time does not account for the provisions within the 1919 Amendment and the Emergency Act that protected individuals who relied on the fact that these works were in the public domain before the proclamations restored their copyrights.  41 Stat. at 369; 55 Stat. at 732.  Congress specifically provided these provisions to "protect the rights lawfully exercised by American users or publishers of copyrighted works[,] protection of which had lapsed [into the public domain]."  H. REP. NO. 77-619, at 2 (July 21, 1941).  Congress' intent, as shown in the House Report on the Emergency Act, was to allow restoration of retroactive copyrights.  *Id.*  Thus, Congress' past actions show a clear history of allowing retroactive copyrights, lending significant weight to the defendants' arguments.  *Burrows-Giles Lithographic*, 111 U.S. at 57.

## 2.  The Plaintiffs' Misplace Their Reliance on Caselaw Interpreting Patent Law

The plaintiffs next argue that the Constitution's IP clause has an implicit public domain limitation.  Pls.' Opp'n at 10-11.  Citing the patent case *Graham v. John Deere Co.*, 383 U.S. 1 (1966), the plaintiffs contend that the IP clause prevents Congress from granting copyright to works already in the public domain.  Pls.' Opp'n at 11-15.  The defendants argue that *Graham* is inapplicable here due to the nature of patents, which differs from the copyrights on the subject of retroactive protection.  Defs.' Mot. to Dismiss at 15.  The court agrees with the defendants.

14

In *Graham*, the Supreme Court held that Congress could not grant a patent to an invention that entered the public domain before the inventor filed a patent application. *Graham*, 383 U.S. at 5-6. The Court stated that, "Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available." *Id.* Although *Graham* deals specifically with patents, the plaintiffs argue that since both patent and copyright stem from the IP clause in the Constitution, the court can apply the *Graham* reasoning to the instant copyright case. Pls.' Opp'n at 14.

While the plaintiffs are correct that "[b]ecause the Clause empowering Congress to confer copyrights also authorizes patents, congressional practice with respect to patents inform [the Court's] inquiry [into copyright]," *Eldred,* 537 U.S. at 201, the differing scope of their protections creates noticeable differences between patent law and copyright law doctrines. *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 101-02 (2d Cir. 1951). Patent law provides the owner with the exclusive right to use a novel idea or invention. *Demetriades v. Kaufmann*, 680 F. Supp. 658, 662 (S.D.N.Y 1988). A copyright, however, gives protection "only to the expression of the idea – not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217 (1954). "While a copyright confers on its owner an exclusive right to reproduce the original work, a patent provides its owner with the far broader right to exclusive use of the novel invention or design for a time-specific period." *Demetriades*, 680 F. Supp. at 662. This "idea/expression dichotomy," underlines the fact that "the requisites for patent eligibility and review [are more] rigorous than the analogous provisions of copyright law." *Id*.

The *Graham* holding is inapplicable to the instant case because *Graham* concerns specific requirements unique to patent law. In *Graham,* the Court based its holding on the rigors

of the patent statute's novelty requirement, which differs fundamentally from the copyright statute's requirements. *Bonita Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 146-50 (1989) (quoting and interpreting *Graham,* 383 U.S. at 6). In fact, the *Graham* court specifically noted that the copyright aspect of the IP clause was not relevant to the decision. *Graham,* 383 U.S. at 6 n.1. The plaintiffs' argument that a copyright cannot remove existing knowledge from the public domain borrows from the requirement that "the applicant for a patent must show that the idea is novel." Pls.' Opp'n at 13-24; *Demetriades,* 680 F. Supp. at 662 (citing NIMMER'S COPYRIGHT, § 2.01[A]). The novelty requirement for patent protection, codified at 35 U.S.C. § 102, specifically excludes knowledge available to the public. *Bonita Boats,* 489 U.S. at 148.

In contrast, the copyright statute has no such novelty requirement. *Sheldon v. Metro-Goldwyn Pictures Corp.,* 81 F.2d 49, 54 (2d Cir. 1936), *aff'd* 309 U.S. 390 (1946). Given the lack of a novelty requirement in copyright law, the plaintiffs' claim that *Graham* precluded Congress from granting copyright to works already in the public domain lacks authority and rationale. *Sheldon,* 81 F.2d at 54. Therefore, the court concludes that the plaintiffs' reliance on *Graham* is misplaced.

### 3. Section 514 Does Not Hinder the Promotion of Science

The plaintiffs also claim that Section 514 violates the preamble of the IP clause because it does not "promote the Progress of Science." Pls.' Opp'n at 25 (citing U.S. CONST. Art. I, § 8, cl. 8). They assert that a *quid pro quo* exists between the government's grants of exclusive rights to a work and the guarantee of public access after the copyright expires. *Id.* Section 514, the plaintiffs contend, prevents this *quid pro quo* from occurring. *Id.* at 26. The defendants argue, however, that the Constitution gives Congress the ultimate authority on the progression of

16

science.  Defs.' Supplemental Mem. at 6.  Thus, the defendants assert that for Section 514 to

pass constitutional muster, the court need only conclude that Congress acted rationally to

promote science in enacting the statute.  *Id.*

Courts have not interpreted the phrase "To promote the Progress of Science and useful

Arts," in the IP clause as constituting a limitation on the power of Congress.  *Schnapper v.

Foley*, 667 F.2d 102, 111-112 (D.C. Cir. 1981).  Indeed, "'[t]he courts will not find that

Congress has exceeded its power so long as the means adopted by Congress for achieving a

constitutional end are "appropriate" and "plainly adapted" to achieving that end.'"  *Id.* (quoting

*Mitchell Bros. Film Group*, 604 F.2d at 860).  Toward that end, the Supreme Court rejected the

plaintiffs' argument that the extension of existing copyrights did not "promote the Progress of

Science" on the grounds that Congress' action had a rational relationship to the progress of

science.  *Eldred*, 537 U.S. at 211.

Following this precedent, the court here determines that Section 514 bears a rational

relation to the progression of science.  Congress' rationale in enacting Section 514 was to secure

the protection of copyrights in foreign countries for U.S. citizens.  Defs.' Supplemental Mem. at

2.  Given industry losses of $43 to $61 billion through piracy because of "inadequate [foreign]

legal protection for United States intellectual property," the Senate noted that implementing

Section 514 "is a significant opportunity to reduce the impact of copyright piracy on our world

trade position."  S. REP. NO. 100-352, at 2, (May 19, 1988).  Accordingly, the court concludes

that Congress' conception of Section 514 has a rational relationship to the promotion of science.

*Schnapper*, 667 F.2d at 112.

### 4. Section 514 Does Not Violate the Originality Requirement

As noted earlier, the IP clause provides Congress the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. CONST. Art. I, § 8, cl. 8. In order for copyright protection to apply to a work, the work must be original. *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 345 (1991). The plaintiffs claim that Section 514 violates this originality requirement because the works at issue here are already in the public domain and that once an author publishes a work, that work is no longer original. Pls.' Opp'n at 24. The plaintiffs contend that a retroactive grant of a copyright is a grant of a copyright on an unoriginal work, and therefore violates the originality requirement. *Id.* In response, the defendants assert that the Supreme Court in *Eldred* ruled that originality depends on the work's originality to the author at the time of creation, and therefore preempts the plaintiffs' argument. Defs.' Supplemental Mem. at 8.

"The *sina qua non* of copyright is originality." *Feist*, 499 U.S. at 345 (1991). The Supreme Court has recognized that the terms "authors" and "for their respective writings" in the IP clause to "presuppose a degree of originality" that must be present for a work to receive copyright protection. *Id.* at 346. Originality merely requires independent creation by the author and just a scintilla of creativity. *Id.*; *accord* 1 NIMMER'S COPYRIGHT §§ 2.01[A], [B] (2003). In addition, the level of creativity necessary to qualify for a copyright is extremely low. 1 NIMMER'S COPYRIGHT § 2.01[B].

In *Eldred*, the Supreme Court held that the originality requirement means only that a modicum of creativity exists, and did not depend on the timing of the grant of copyright

protection.  537 U.S. at 211.  Indeed, the requirement of creativity requires only that the author

independently created the work.  1 NIMMER'S COPYRIGHT § 2.01[B].  In the instant case, the

works to which Section 514 restores copyrights already comply with the originality requirement

because Section 514 only covers works that would be eligible for copyrights but for the

formalities imposed by the United States, lack of subject-matter protection or lack of national

eligibility.  17 U.S.C. § 104A(h)(6)(C)(i)-(iii).  Thus, works to which Section 514 retroactively

grants copyrights already contain the modicum amount of creativity necessary to qualify for a

copyright.  *Id.*  Accordingly, Section 514 does not violate the IP clause's originality requirement.

*Eldred*, 537 U.S. at 210-211.

### D.  The Court Concludes That Section 514 Does Not Violate the First Amendment

Finally, the plaintiffs claim that Section 514 violates the First Amendment because it

restricts the freedom of expression of works already in the public domain.  Compl. ¶ 48-51.  The

defendants argue – and the court agrees –  that *Eldred* bars this argument.

The *Eldred* Court held that "[t]he First Amendment securely protects the freedom to

make . . . one's own speech; it bears less heavily when speakers assert the right to make other

people's speeches."  *Eldred*, 537 U.S. at 221.  In fact, by offering an economic incentive, "the

Framers intended copyright itself to be the engine of free expression."  *Harper & Row*

*Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985).  For those instances when copyright

protection raises First Amendment concerns, copyright law contains built-in accommodations for

First Amendment speech such as through the idea/expression dichotomy and the fair use

doctrine.[5]  *Eldred*, 537 U.S. at 219-21.  When Congress "has not altered the traditional contours

---

[5]  The fair-use doctrine, codified at 17 U.S.C. § 107 provides that "the fair use of a copyrighted work,
including such use by reproduction in copies . . . for purposes such as criticism, comment, news reporting,

of copyright protection, further First Amendment scrutiny is unnecessary." *Id*. at 221 (citing *Harper & Row*, 471 U.S. at 560).

In the instant case, Congress has not altered the traditional contours of copyright protection by enacting Section 514. *See generally* 17 U.S.C. § 104A. Section 514 does alter First Amendment accommodations such as the idea/expression dichotomy or the fair-use doctrine. *Id*. In fact, Section 514 supplements First Amendment protections by protecting parties who already have exploited the restored copyrighted work while in the public domain. *Id*. § 104A(d)(2). It allows parties to exploit a restored work indefinitely if no notice is provided, immunizes parties for acts prior to notification and allows a party to continue exploiting the copyrighted works for a year after notice. *Id*. In addition, Section 514 allows the continued exploitation of derivative works based on a restored copyright as long as the restored copyright holder receives reasonable compensation. *Id*. § 104A(d)(3). Given that Section 514 does not encroach on the traditional copyright protections and includes additional protections, further scrutiny under the First Amendment is unnecessary. *Eldred*, 537 U.S. at 221. Thus, the court grants the defendants' motion to dismiss on this basis as well. *Id*; *Warren*, 353 F.3d at 37.

---

teaching (including multiple copies for classroom use), scholarship or research, is not an infringement of copyright."

## IV.  CONCLUSION

For all these reasons, the court grants the defendants' motion to dismiss.  An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 19th day of June, 2004.

RICARDO M. URBINA
United States District Judge